The appellant, Charles T. Hall, was convicted of murder, a violation of § 13A-6-2, Ala. Code 1975, and robbery in the first degree, *Page 1045 
a violation of § 13A-8-41, Ala. Code 1975. He was sentenced, as a habitual felony offender, to life imprisonment without parole for each conviction. On appeal, Hall contends that the trial court erred when it allowed his former wife to testify, over his objection, as to what Hall maintains were privileged confidential communications that occurred between them during their marriage.
The record reflects that on March 29, 1989, the body of Roger Ferrell was discovered by the side of a country road in a wooded area of Bullock County. Ferrell had been shot nine times; an autopsy revealed that he died as a result of multiple gunshot wounds to the head and chest. Two days before Ferrell's body was discovered, his car was found abandoned in Georgetown, Georgia. The car's interior was stained with blood. Based on forensic evidence found inside the car, including blood spatters, brain matter, and bullet fragments, investigators concluded that someone had been shot in the head while sitting in the driver's seat. A cassette tape case containing $48,900 in cash was discovered in the car's trunk.
Ferrell's girlfriend, Lois Reeves, told investigators that she last saw Ferrell alive on the evening of March 25, 1989, when Ferrell left their Bullock County residence in his car. Reeves said that at that time Charles Hall was a passenger in Ferrell's car. At Hall's trial, Reeves testified that when Ferrell did not come home on March 25, she telephoned Hall the morning of March 26 to ask about Ferrell's whereabouts. Hall told Reeves that he had last seen Ferrell the previous evening, when, according to Hall, Ferrell had left him at a gasoline service station in Union Springs after becoming angry with him.
Jimmy Simpson, an investigator with the Alabama Bureau of Investigation, testified that he questioned Hall on April 9, 1989, in connection with Ferrell's murder. After advising Hall of his Miranda rights and obtaining his signature on a written waiver, Simpson took a statement from Hall. In his statement, which was read into evidence at trial by Simpson, Hall told Simpson that he was with Ferrell on the night of March 25, 1989, but he denied any knowledge of, or involvement in, Ferrell's murder. Hall stated that he had contacted Ferrell earlier that day and had told him that he had arranged for a meeting that evening in Union Springs with an individual who was "coming up" from Florida to sell Ferrell eight kilograms of cocaine. (R. 185.) Hall stated that this individual did not exist, but that he had concocted the story to "buy a little time" with Ferrell, who, Hall said, had been talking about buying drugs from someone else.[1] According to Hall, he accompanied Ferrell to Union Springs in Ferrell's car on March 25, and Ferrell left him at a gasoline service station at around 10:00 p.m., after the fictitious seller failed to appear. Hall stated that after Ferrell dropped him off, he telephoned his friend Eddie Wesley, and Wesley and his girlfriend, Donna Singleton, picked him up and eventually drove him home at about 1:00 a.m.
On October 23, 1991, over two years after he gave his initial statement to Simpson, Hall provided Simpson with a second statement. Before making the second statement, Hall was again advised of his Miranda rights, and he again signed a written waiver. In this statement, which was also read into evidence at trial by Simpson, Hall admitted that he was present when Ferrell was killed on the night of March 25, 1989; however, Hall maintained that he did not kill Ferrell, but that Eddie Wesley committed the murder. According to Hall, he and Ferrell drove to Union Springs in Ferrell's car to meet Wesley's *Page 1046 
"contact" from Florida, who, Hall said, was going to sell Ferrell five kilograms of cocaine. (R. 196.) Wesley was to meet them in Union Springs in his own van. Hall stated that after he and Ferrell arrived in Union Springs, Ferrell parked his car near Wesley's van. According to Hall, Wesley then got out of his van and approached the car where he and Ferrell were sitting, walked up to Ferrell, who was sitting in the driver's seat, and shot Ferrell several times with a pistol. Hall said that Wesley then took a rifle and fired one or two more shots at Ferrell. Hall stated that he helped Wesley remove Ferrell's body from the car and drag it off the roadway. He stated that Wesley then took a paper bag with money in it from the front seat of Ferrell's car. At Wesley's direction, Hall said, he drove Ferrell's car to Georgetown, Georgia. Wesley and Donna Singleton followed in Wesley's van. After abandoning Ferrell's car in Georgetown, Hall said, he returned to Alabama with Wesley and Singleton. According to Hall, Wesley gave him $500 when he dropped him off at his house that night. He stated that Wesley gave him $5,000 a few days later and told him to leave town. Hall said that he gave his wife $300 or $400 of the money Wesley had given to him, kept $1,500, and buried the rest. He stated that he then caught a bus for Texas, and that before he left he told his wife where he had buried the rest of the money Wesley had given to him. There was no indication in Hall's second statement to Simpson that Hall was aware that Wesley planned to shoot Ferrell when Hall and Ferrell arrived in Union Springs.
At trial, the state presented testimony from Hall's former wife, Deborah Mylius, who was married to Hall at the time of Ferrell's murder. Mylius and Hall were divorced in 1990 after 18 years of marriage. Over Hall's objection on the ground that the matter involved a "confidential communication" protected under the "husband-wife privilege" recognized in Rule 504, Ala. R.Evid., Mylius was allowed to testify that in June 1989, while she and Hall were married and were spending a weekend together at a recreational area near Lake Martin known as Kowaliga, where they were expecting to be joined later by Eddie Wesley and Donna Singleton, Hall said to her, "I guess you know I'm the one who killed Roger [Ferrell]." (R. 235.) According to Mylius, when she asked Hall why he was telling her this, Hall responded that "he was afraid Donna or Eddie would say something to [Mylius] over the course of the weekend." (R. 235.) Mylius stated that she and Hall were alone and were walking on a bridge when Hall made the statement and that Wesley and Singleton had not yet joined them. She testified that after Wesley and Singleton joined her and Hall that weekend, Ferrell's murder was never again mentioned by anyone. In allowing Mylius to testify concerning Hall's statement to her, the trial court found that Hall had made the statement in anticipation of the murder being discussed when Wesley and Singleton arrived and that, therefore, Hall had not intended the statement to remain confidential. The court held that the statement was not protected against disclosure under the husband-wife privilege.
Mylius was also allowed to testify, over Hall's assertion of the husband-wife privilege, that she had seen Hall in possession of "large amounts of money" around March 26, 1989. (R. 235.) In allowing this testimony, the trial court found that Hall's possessing money in Mylius's presence did not constitute a "communication" protected by the husband-wife privilege.[2]
In essence, the husband-wife privilege provides that where a spouse wishes to testify against an accused spouse, the witness spouse generally is precluded from divulging the confidential communications of the accused *Page 1047 
spouse made during the marriage. See Advisory Committee's Notes to Rule 504, Ala.R.Evid. Rule 504, Ala.R.Evid., perpetuates Alabama's husband-wife privilege for confidential communications. See Arnold v. State, 353 So.2d 524
(Ala. 1977); Cooper v. Mann, 273 Ala. 620, 143 So.2d 637
(1962); Owen v. State, 78 Ala. 425 (1885); Handleyv. State, 515 So.2d 121 (Ala.Cr.App. 1987); State v.Browder, 486 So.2d 504 (Ala.Cr.App. 1986). Rule 504 states, in pertinent part:
 "(a) Definition of `Confidential' Communication. A communication is `confidential' if it is made during marriage privately by any person to that person's spouse and is not intended for disclosure to any other person.
 "(b) General Rule of Privilege. In any civil or criminal proceeding, a person has a privilege to refuse to testify, or to prevent any person from testifying, as to any confidential communication made by one spouse to the other during the marriage.
 "(c) Who May Claim the Privilege. The privilege may be claimed by either spouse, the lawyer for either spouse in that spouse's behalf, the guardian or conservator of either spouse, or the personal representative of a deceased spouse. The authority of those named to claim the privilege in the spouse's behalf is presumed in the absence of evidence to the contrary."
The husband-wife privilege is discussed at length in C. Gamble, McElroy's Alabama Evidence § 103.01(4) (5th ed. 1996):
 "A witness spouse is both competent and compellable when called to testify against the other spouse in a civil case. When called in a criminal case against the accused spouse, the witness spouse is competent but not compellable; meaning that the witness spouse generally has a privilege not to testify for or against the accused spouse. In summary, a willing spouse may give adverse testimony against the other spouse in both civil and criminal cases. Even after taking the stand, however, such witness spouse generally may not divulge confidential communications that transpired between the two of them. The historic justification for the privileged communications rules is to encourage family harmony by fostering communications between spouses. It was for the promotion of this policy that [Rule 504,] Alabama Rule[s] of Evidence was adopted.
 ". . . .
 "Rule 504(a) provides protection, under Alabama's husband-wife privilege, for confidential communications. As under preexisting law, however, the term `communication' is given an expansive interpretation to include acts as well as communications. Indeed, the privilege for confidential communications between spouses applies not only to statements but also to knowledge acquired by one spouse's observation of an act of the other in private if the circumstances indicate that the actor-spouse did the act in the presence of the other spouse solely because of the confidence normally inspired by the marriage relationship. Stated differently, the privilege applies to exclude all knowledge coming to the witness spouse by reason of the relationship and which, but for the confidence growing out of it, would not have been known. The key to privileged status lies in the requirement that the statement or act must have been made privately and not intended for disclosure to any third person. Confidentiality turns upon the intent of the communicating or acting spouse as judged from objective facts. Evidence of such intent may include an express declaration of confidentiality. More normally, however, such proof involves circumstances under which the communication was made or the act committed.
 "If it is shown that the communication or act arose in the privacy of the spousal relationship, the party asserting the privilege benefits from a presumption of confidentiality. This presumption, however, disappears when facts show that no confidentiality was intended. . . .
 ". . . .
 "The present privilege applies only if the parties are validly married at the time the information is transmitted. . . .
 "Unlike the testimonial privilege, under which the parties must have a valid marriage at the time the witness spouse is called to the stand, the present confidential *Page 1048 
privilege applies without regard to whether the parties are married at the time the privilege is asserted. The only legitimate inquiry is whether they were married at the time the information was exchanged. Indeed, the present privilege survives both divorce and death.
 ". . . .
 "The present privilege belongs to both spouses; either may assert it, whether on the witness stand or not. A spouse may refuse to disclose and may prevent disclosure by the other spouse or a third party, so long as the elements of the privilege are satisfied. . . .
 ". . . .
 "A spouse waives the privilege, at least as to that spouse's own claim of benefit under it, by disclosing or consenting to the disclosure of the matter to a third party. Such disclosure, however, does not rise to the level of waiver unless it involves a significant part of the privileged matter."
McElroy's Alabama Evidence § 103.01(4)(a), (b), (c), (e), and (f) at 481-88 (footnotes omitted). See also 8 Wigmore on Evidence §§ 2332-41 (McNaughton rev. 1961);McCormick on Evidence §§ 78-86 (3d ed. 1984); and 3 F. Wharton, Criminal Evidence § 826 (12th ed. 1955).
"[M]arital communications are presumptively confidential."Blau v. United States, 340 U.S. 332, 333, 71 S.Ct. 301,302, 95 L.Ed. 306, 308 (1951). See McElroy's AlabamaEvidence § 103.01(4)(b) at 483. "[T]hat presumption may be overcome by proof of facts showing that they were not intended to be private." Pereira v. United States,347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435, 443 (1954). We do not think the evidence adduced in this case overcame the presumption of confidentiality; thus, we conclude that the trial court incorrectly determined that Hall's statement to Mylius that he had killed Ferrell was not a confidential communication protected against disclosure under the husband-wife privilege.
It appears from Mylius's testimony that Hall made the statement to her not because he intended for it to be divulged to any third person, but because he feared that Eddie Wesley or Donna Singleton would disclose his involvement in Ferrell's killing during the course of their weekend together, and he was therefore seeking to mitigate the impact such disclosure might have on Mylius. There is no indication that Hall hoped that his participation in the killing would be mentioned by Wesley or Singleton or that he intended to discuss the matter himself when Wesley and Singleton arrived. Nor is there any indication that Hall wanted Mylius to divulge the substance of his statement to anyone else, including Wesley or Singleton. Moreover, it is not even clear from Hall's alleged explanation to Mylius for making the confession to her — i.e., that "he was afraid" Wesley or Singleton would "say something" to her during the weekend — that Hall feared, when confessing, that the information Wesley or Singleton might disclose to Mylius was the same information imparted in his confession to Mylius: Hall did not expressly state to Mylius that Wesley and Singleton knew that he had killed Ferrell; he indicated only that he feared they might say something relating to the murder. Significantly, Hall made the confession to Mylius before Wesley and Singleton arrived; according to Mylius, she and Hall were alone at the time. Considering all the circumstances, we can only conclude that Hall's statement to Mylius was made in the confidence of the marital relationship, without any intention that it be disclosed. Sustaining the inference that Hall did not desire disclosure of the matter is Mylius's testimony that Ferrell's murder was, in fact, never mentioned by anyone after Wesley and Singleton joined her and Hall for the weekend. Because Hall's statement to Mylius was made privately during their marriage and was not intended for disclosure, it constituted a "confidential communication" and was thus protected by the husband-wife privilege.
Citing Rule 510, Ala.R.Evid., the state argues that even if Hall's statement to Mylius constituted a confidential communication so as to come within the husband-wife privilege, Hall subsequently waived the protection of that privilege when, in November 1996, well after the couple had divorced, Hall sent a letter to Mylius containing what the state maintains was "substantially the same information" imparted in his June 1989 confession *Page 1049 
to Mylius. The letter, a copy of which is contained in the record, was written by Hall while he was in jail awaiting trial for the murder and robbery of Ferrell.
Rule 510, Ala.R.Evid., which sets forth the waiver doctrine with regard to privileges, provides:
 "A person upon whom these rules confer a privilege against disclosure waives the privilege if the person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged."
The Advisory Committee's Notes to Rule 510 state, in pertinent part:
 "The waiver doctrine has two significant limitations. First, waiver arises only when the holder has disclosed, or allowed disclosure of, the `privileged matter.' . . . Even if the holder discloses a portion of the privileged matter, however, the second limitation is that the disclosure must be of a `significant part' of it. Disclosure of an insignificant part of the privileged matter does not waive the privilege. Whether a significant part of the privileged matter has been disclosed is a common sense question for the judge."
See McElroy's Alabama Evidence § 103.01(4)(f). The state asserts that in his November 1996 letter to Mylius, Hall voluntarily disclosed a significant part of the alleged confidential communication of June 1989 to a person not then his wife (i.e., Mylius, who by that time was his former wife), thereby waiving any protection against disclosure as to the confidential communication that might otherwise be afforded under the husband-wife privilege. Thus, the state says, the trial court properly allowed Mylius to testify concerning Hall's June 1989 statement to her that he had killed Ferrell.
The state's argument fails for the simple reason that Hall, in the November 1996 letter to Mylius, does not admit, as he allegedly did in June 1989, his participation in the murder of Ferrell, but instead suggests that Wesley was the killer and further suggests that after the murder, Wesley deliberately shifted suspicion for the crime to Hall. Hall also indicates in the letter that Mylius must have misunderstood, possibly because she had been drinking, what he had told her (in June 1989) about who had killed Ferrell. In sum, Hall's letter was self-exculpatory, while his alleged statement of June 1989 was clearly inculpatory. Thus, the letter did not disclose a "significant part" of the matter protected by the husband-wife privilege and did not constitute a waiver of Hall's protection against disclosure of his confidential communication to Mylius during their marriage. Rule 510, Ala.R.Evid.
We therefore hold that it was error for the trial court to allow Mylius to testify that Hall told her in June 1989 that he had killed Ferrell. This error cannot be deemed harmless because Hall's alleged confession to Mylius was the evidence that most clearly established Hall's participation in Ferrell's murder, and a jury might reasonably be expected to accord substantial weight to such a confession, in part because of the very fact that it was made privately by a husband to his wife.
As to Hall's contention that the trial court also erred in allowing Mylius to testify that she had seen Hall in possession of "large amounts of money" around March 26, 1989, our review of the record reveals that no evidence was presented to indicate the circumstances under which Mylius allegedly came to observe the money in Hall's possession. Although the husband-wife privilege for confidential communications applies not only to statements but, in appropriate circumstances, also to knowledge acquired by one spouse's observation of an act of the other in private, there is nothing to indicate that Hall's act of having the money in Mylius's presence grew out of the confidence inspired by their marital relationship. See McElroy'sAlabama Evidence, § 103.01(4)(b) at 483. Thus, we cannot say that the trial court erred in allowing Mylius to testify concerning her observations.
Moreover, even if we were to assume that Hall's act of having a large amount of money in Mylius's presence did grow out of the confidence inspired by their marital relationship and therefore constituted a privileged confidential communication, Hall *Page 1050 
waived the protection of that privilege when he acknowledged in his October 23, 1991, statement to Alabama Bureau of Investigation Investigator Jimmy Simpson that Eddie Wesley had given him $5,500 in the days immediately following Ferrell's murder and that he, in turn, had given some of this money to Mylius and had told her where he had buried the rest. Hall also testified to substantially the same facts at trial. Thus, with respect to his act of having the money in Mylius's presence, Hall voluntarily disclosed a "significant part" of the matter he claims was protected by the husband-wife privilege and thereby waived the protection of that privilege. Rule 510, Ala.R.Evid. Finally, even assuming that Hall did not waive the protection of this privilege, any error in admitting Mylius's testimony concerning her observations was harmless, because her testimony in this regard was merely cumulative of other testimony that was properly admitted at trial. See Rule 45, Ala.R.App.P.
For the reasons stated above, we reverse the judgment of the trial court and remand the cause to that court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, COBB, BROWN, and BASCHAB, JJ., concur.
[1] Hall's contention at trial was that he was working as an undercover drug informant for state and federal agencies at this time, and that his actions on March 25, 1989, were part of a plan by law enforcement authorities to "set up" Ferrell, who, he said, was the subject of a narcotics investigation. Jimmy Davis, an agent with the Alabama Alcoholic Beverage Control Board, testified at trial that Hall had worked for the Board as a paid informant in drug cases investigated in 1988 and 1989 and that, as part of an investigation targeting Ferrell, Hall had made an undercover buy of cocaine from Ferrell in February 1989. Davis testified that, to the best of his knowledge, the February 1989 purchase from Ferrell was Hall's last involvement in the Board's investigation of Ferrell and that Hall was not working in cooperation with the Board in any investigation of Ferrell around the latter part of March 1989, when Ferrell was murdered.
[2] Before trial, Hall filed a motion in limine seeking to prevent the state from eliciting Mylius's testimony concerning Hall's statement to her and her having seen Hall with a large amount of money. A pretrial hearing was held on Hall's motion, after which the trial court denied the motion. Hall subsequently made proper and timely objections to Mylius's testimony when it was offered at trial. We disagree with the state's contention that Hall's objection at trial was insufficient to preserve for review the trial court's ruling on Mylius's testimony concerning her observation of Hall in possession of the money. See C. Gamble, McElroy's Alabama Evidence § 426.01(5) (5th ed. 1996); Ex parte American Carpet Sales, Inc.,477 So.2d 973, 974 (Ala. 1985).