**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Javan McBURROWS, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 15, 2000.

Filed June 1, 2001.

Mary M. Killinger, Assistant District Attorney, Norristown, for Com., appellant.

Garrett D. Page, Norristown, for appellee.

Before: McEWEN, President Judge, DEL SOLE, KELLY, POPOVICH, JOHNSON, JOYCE, MUSMANNO, ORIE MELVIN and LALLY–GREEN, JJ.

ORIE MELVIN, J.

¶ 1 In this prosecution for murder in the first degree, the Commonwealth has appealed from the Order which granted in part the defense's omnibus pre-trial motion to suppress the testimony of the Appellee's wife on the grounds of spousal privilege pursuant to 42 Pa.C.S.A. § 5914. At issue is whether a wife's observation of her husband's disposal of the alleged murder weapon is a confidential communication between spouses protected under § 5914. For the reasons that follow, we reverse.

¶ 2 The facts and procedural history may be summarized as follows. On January 15, 1999, the Appellee was charged with first and third degree murder, voluntary manslaughter, recklessly endangering another person, possessing an instrument of a crime and endangering the welfare of children.[1] These charges arose out of the fatal abuse allegedly inflicted by the Appellee against a minor child, Michael Davis (age 4), who was in his care on January 9, 1999.[2]

¶ 3 On the evening in question, the Appellee's wife, Mrs. McBurrows, testified she observed the abuse which was inflicted upon the victim. The suppression court summarized her rendition of the events from her statements to the police on January 11, 1999 and January 13, 1999 as well as her preliminary hearing testimony on March 3, 1999 as follows:

Mrs. McBurrows was at home at the time of the events leading up to Michael's death in the early morning hours (approximately 3:00 a.m.) of January 9,

1. The Appellant was also charged in a separate criminal complaint filed on February 23, 1999 of one count of aggravated assault, six counts of terroristic threats, six counts of simple assault as a misdemeanor of the first degree, one count of simple assault as a misdemeanor of the second degree and six counts of endangering the welfare of children.

2. On that date, the Appellee and his wife resided in North Hills, Upper Dublin Township with their five minor children. At this time, the McBurrows' were also caring for three other minor children, one of which was the victim, Michael Davis. The three minor children were siblings who had been placed with the McBurrows' at the request of their mother and grandmother and had been residing there since Thanksgiving 1998.

1999. She was in her second-floor bedroom with her baby and her 18 month old when her husband summoned Michael into the bathroom, which was next to Mrs. McBurrows' bedroom. Michael walked in upon [one of the minor female children] using the toilet.

According to Mrs. McBurrows, her husband had made the children close their eyes when they found someone of the opposite sex in the bathroom. Michael apparently had failed to do this, and Mrs. McBurrows overheard her husband question Michael as to what he was supposed to do when he saw a female in the bathroom. Michael was unresponsive, and Mrs. McBurrows heard her husband slap the child on both sides of his face. Mrs. McBurrows walked into the bathroom and heard the defendant repeat the question. This time, Michael replied that he was supposed to close his eyes. She saw her husband hit the child again. Defendant asked the question one more time and, again, Michael responded as before. Defendant hit him a third time, and Michael answered yet a third time that he should close his eyes.

Defendant stopped beating Michael to feed him pizza. Shortly thereafter, Mrs. McBurrows' attention was once again drawn to the scene in the bathroom, where defendant was now holding a mason's level and admonishing Michael that he was not to do "nasty" things because he was a boy. Defendant asked Michael what he was. When Michael replied that he was a boy, defendant swung the level and struck Michael twice on the back of his legs. Mrs. McBurrows tried to intervene, but defendant raised the level at her, demanding to know what she wanted. Fearing for her safety, she backed down.

Defendant again asked Michael what he was and, again, Michael said he was a boy. Defendant struck him another time on the legs. Mrs. McBurrows saw him strike the child with the level a total of five to ten times on the legs. Eventually, Michael fell to the floor.

Subsequently, Michael asked defendant if he could have something to drink. Defendant gave him carrot juice and water and then forced him to walk back and forth the length of the second floor about four or five times.

When Mrs. McBurrows saw the boy tire, she cautioned her husband. Defendant put the child's coat on and pulled him outside into this snowy front yard. The child's shoe had come off and, as his foot sank into the snow, he commented that his shoe was gone. After rubbing snow in the child's face, defendant took him upstairs and placed him in the bathtub, which was full of water. By that time, however, the water was cold, and defendant directed his wife to go downstairs and bring up hot water for Michael's bath.

Five to ten minutes later, Mrs. McBurrows returned to the bathroom and saw that Michael's eyes were closing. She left to get more water. When she re-entered the bathroom, she saw defendant throw Listerine antiseptic in the child's eyes. She returned to her bedroom; it was not long before she heard gurgling sounds coming from the bathroom and heard her husband call to her that Michael was "in trouble" She went into the bathroom and saw her husband lift the child from the bathtub and, after that, to try to open the child's mouth with his fingers. He could not. He told his wife to get more warm water.

When she returned, defendant had Michael across his knees and was slapping him on the back. Michael vomited in the tub. Defendant laid him on the floor and performed CPR. Michael vomited

again. Defendant asked his wife to listen for the boy's heartbeat. Hearing only a faint heart beat, she demanded they take Michael to hospital.

Defendant wrapped Michael in a sheet and carried him to their van, instructing her to drive to the hospital. As he was doing this, he asked his wife if she was going to "fold" on him. She proceeded to take Michael by herself to Abington Hospital.

Almost three hours later, at approximately 7:00 a.m., she returned home and told her husband that Michael had been transported from Abington Hospital to Children's Hospital of the University of Pennsylvania (CHOP). Shortly thereafter, Mrs. Darlene David appeared at the house. Defendant had asked her to watch the children while he and his wife went for a short drive. Defendant did not tell Mrs. David or his wife where they were going.

As Mrs. McBurrows got in the van, she saw two mason's levels inside an open plastic bag on the floor of the front seat. One of the levels was the one she saw her husband use to strike Michael that morning. She saw a second bag from which protruded a BB rifle.

Defendant drove them to an abandoned church in the Germantown section of Philadelphia, where he stopped the van, took the levels from the bag and threw them over the fence. As he threw them, he told her he was donating them. Mrs. McBurrows said she heard one of the levels hit what sounded like a pole on the other side of the fence.

On their way back to their house, Mrs. McBurrows placed a call on her cellular phone to CHOP to check on Michael's condition. While the hospital was processing her inquiry, a call came in from Mother Davis, Michael's grandmother, which defendant answered. Defendant

apparently having been told Michael had died, screamed "I don't believe it." He also spoke with Erika Daye, Michael's biological mother, and one of the CHOP doctors. He passed the phone to his wife, who also spoke with Mother Davis and assured her they would be on their way to CHOP.

The McBurrows drove home, awakened the children, loaded his own children into the van and the Daye children into Mrs. David's car. Mrs. McBurrows thought the plan was that Mrs. David would drive their children to her home in Edgewater Park, New Jersey, and she and her husband would take Mrs. David's car with the Daye children to be with their mother at the hospital. As it turned out, at the last moment, a police car drove down the street as they were in the final stages of departure. Defendant climbed into his van with his five children and drove off. Mrs. McBurrows then accompanied Mrs. David and the Daye children in the car to Mrs. David's house in Edgewater Park, New Jersey. Along the way, Mrs. McBurrows contacted her husband to let her know where they were going. As they pulled into Mrs. David's house, defendant was waiting for them.

Defendant quickly collected the Daye children into the van and proceeded to drive to Georgia, where Mrs. McBurrows' sister lived. Along the way, Mrs. McBurrows noticed the bag with the BB rifle was no longer in the van. Defendant told her he threw the bag in the sewer. He asked if she was still "with him" or if she was going to "fold" on him. He discussed his going to jail and whether she would remarry. He insisted that he would be set up if he went to CHOP. He also admitted to her he might have injured Michael by trying to

resuscitate him and hitting him on the back.

They arrived at her sister's house in Georgia on January 10, 1999 at 3:00 a.m., and Defendant was soon apprehended by the police.

Suppression Court Opinion, 8/31/99, at 3–7.

¶ 4 On May 18, 1999, the Appellee filed an omnibus-pre-trial motion seeking among other things, to preclude the testimony of his wife on the basis of spousal immunity or privileged communications pursuant to 42 Pa.C.S.A. §§ 5913, **Spouses as witnesses against each other**, and 5914, **Confidential communications between spouses**. A hearing was held on the motion on June 28, 1999. Following the hearing, the defense agreed to submit the challenged portions of Mrs. McBurrows' testimony from her statements given to the police on January 11, 1999 and January 13, 1999, as well as her testimony from the preliminary hearing on March 3, 1999.

¶ 5 By Order dated July 20, 1999, the suppression court granted in part and denied in part Appellee's suppression motion. For purposes of this appeal, the suppression court found Mrs. McBurrows' testimony regarding her observation of Appellee's disposal of the mason's level allegedly used to beat the victim to death was privileged pursuant to § 5914.[3] The Commonwealth filed a notice of appeal on July 21, 1999. In the notice of appeal, the Commonwealth certified pursuant to Pa.R.A.P. 311(d), the suppression Order appealed from terminated or substantially handicapped their case. Because the Commonwealth's good faith certification provides an absolute right to appeal, there is no dispute that our jurisdiction over this appeal is proper. *Commonwealth v. Allburn*, 721 A.2d 363 (Pa.Super.1998), *appeal denied*, 559 Pa. 662, 739 A.2d 163 (1999); *Commonwealth v. Pitts*, 740 A.2d 726 (Pa.Super.1999); *Commonwealth v. Witherspoon*, 756 A.2d 677 (Pa.Super.2000).

¶ 6 The Commonwealth alleges the suppression court erred in precluding the testimony of Mrs. McBurrows concerning her observations relating to her husband's disposal of the mason's level allegedly used in the beating death of the minor victim. The Commonwealth argues such observations did not fall under the confidential communication privilege between spouses pursuant to 42 Pa.C.S.A. § 5914.

¶ 7 Our standard of review of a suppression court ruling is well settled.

When reviewing the Commonwealth's appeal from the decision of the suppression court, we must consider only the evidence of the ... appellee's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. If the evidence supports the factual findings of the trial court, we are bound by such findings, and we may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Brandt*, 456 Pa.Super. 717, 691 A.2d 934, 936 (1997), *appeal denied*, 549 Pa. 695, 700 A.2d 437 (1997)(quotations and citations omitted).

---

**3.** In Mrs. McBurrows' statement of January 11, 1999 she stated the Appellant pulled in front of an abandoned church, threw two mason's levels over the fence and indicated he was donating the levels for someone else's use. In Mrs. McBurrows' preliminary hearing testimony on March 3, 1999, she provided similar testimony but did not mention the Appellant's statement regarding his intent to "donate" the levels. The suppression court found Mrs. McBurrows' statement and testimony regarding the disposal of the mason's levels were privileged.

¶ 8 We begin with an analysis of the confidential communications privilege codified at 42 Pa.C.S.A. § 5914.

### § 5914. Confidential communications between spouses

Except as otherwise provided in this subchapter, in a criminal proceeding, neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon trial.

42 Pa.C.S.A. § 5914.[4]

¶ 9 This "privilege prevents a husband or wife from testifying against their spouse as to any communications which were made during the marital relationship." *Commonwealth v. May*, 540 Pa. 237, 249, 656 A.2d 1335, 1342 (1995). The privilege remains in effect through death or divorce. *Commonwealth v. Clark*, 347 Pa.Super. 128, 500 A.2d 440, 441 (1985), *appeal dismissed*, 516 Pa. 16, 531 A.2d 1108 (1987). The confidential communication cannot be divulged without the consent of the other spouse. *Commonwealth v. Wilkes*, 414 Pa. 246, 251, 199 A.2d 411, 413 (1964), *cert. denied*, 379 U.S. 939, 85 S.Ct. 344, 13 L.Ed.2d 349 (1964). The public policy sought to be enhanced by this privilege is the preservation of marital harmony and the resultant benefits to society from that harmony. *Commonwealth v. Savage*, 695 A.2d 820, 822 (Pa.Super.1997). Communications between spouses are presumed to be confidential, and the party opposing application of the rule disqualifying such testimony bears the burden of overcoming this presumption. *Hancharik*, 534 Pa. at 442, 633 A.2d at 1078. (1993). In order for a confidential communication between spouses to be protected, knowledge must be gained through the marital relationship and in the confidence which that relationship inspires. *Commonwealth v. Dubin*, 399 Pa.Super. 100, 581 A.2d 944, 946 (1990), *appeal denied*, 527 Pa. 592, 588 A.2d 912 (1991). In order to be protected under § 5914, it is essential that the communication be made in confidence and with the intention it not be divulged. *Commonwealth v. Darush*, 279 Pa.Super. 140, 420 A.2d 1071, 1075 (1980), *vacated on other grounds*, 501 Pa. 15, 459 A.2d 727 (1983). "Therefore, whether a particular communication is privileged depends upon its nature and character of the circumstances under which it was said." *Id.* Accordingly, if the nature of the communication is not imbued with an aura of a sharing disclosure precipitated largely due to the closeness spouses share, then arguably it is not privileged. *Commonwealth v. Spetzer*, 722 A.2d 702, 711 (Pa.Super.1998), *appeal granted*, 560 Pa. 744, 747 A.2d 368 (1999) (holding husband's direct threats to injure or kill his wife do not have the aura of confidentiality which is the hallmark of the marital privilege).

¶ 10 Generally, the confidential communications protected under § 5914 have been limited to oral or written communications. Our Supreme Court has never di-

---

**4.** This privilege is separate and distinct from the privilege against adverse spousal testimony embodied in 42 Pa.C.S.A. § 5913. *Commonwealth v. Newman*, 534 Pa. 424, 633 A.2d 1069 (1993); *Commonwealth v. Hancharik*, 534 Pa. 435, 633 A.2d 1074 (1993); *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). We note the Commonwealth has not alleged Mrs. McBurrows was competent to testify as to her husband's disposal of the mason's levels pursuant to any of the exceptions listed under 42 Pa.C.S.A. § 5913. Although the exceptions permit a spouse to testify against another spouse in cases involving bodily injury to minor children in their care and in cases involving murder, the exceptions do not render a spouse competent to testify to confidential communications pursuant to § 5914. *Newman*, 534 Pa. at 432, 633 A.2d at 1072. Accordingly, we focus on § 5914.

rectly addressed whether the privilege should be extended to non-verbal conduct. *See Hancharik,* 534 Pa. at 444, fn. 3, 633 A.2d at 1078, fn. 3 (stating, "[w]e have not had the occasion to actually decide, however, whether the *statutory* rule phrased solely in terms of 'confidential communications,' encompasses more than verbal exchanges.") However, this Court briefly addressed the extension of the privilege in *Commonwealth v. Clark, supra.*

¶ 11 In *Clark,* the trial court permitted the appellant's ex-wife to testify regarding confidential communications made during the marriage. The trial court allowed this testimony after determining the appellant waived the privilege by relating the substance of the confidential communications to third parties while in prison. The substance of Mrs. Clark's testimony concerned certain communications the appellant made to her before and after his commission of an armed robbery of a gas station which resulted in the death of the attendant. Specifically, Mrs. Clark testified she picked her husband up from work at approximately 11:00 p.m. After they arrived home, she testified he left the house carrying a shotgun. At that time, he told her he was planning on robbing a gas station. Twenty minutes later, he returned home, told Mrs. Clark he thought he shot and killed somebody and instructed her to call the police. After Mrs. Clark anonymously called the police, she accompanied her husband to a location where he broke the shotgun in half and disposed of the pieces.

¶ 12 In reversing the defendant's judgment of sentence and remanding the case for a new trial, the *Clark* court found that despite what the Appellant reiterated to a third party at a later time, the original confidence between the Appellant and his wife remained intact. Therefore, it concluded the trial court erred in permitting Mrs. Clark to testify against the Appellant. The *Clark* court also briefly addressed whether Mrs. Clark's observations regarding the disposal of the shotgun were privileged under § 5914.

A further question arises as to whether her observations of appellant washing the shotgun and disposing of it also falls within this privilege. While there is no Pennsylvania case law regarding this issue, **it would be anomalous to exclude acts done at the time the confidential oral communications were made from the protection of the privilege. The marital relationship gave rise to both the statements and the actions surrounding the gun. Thus, Mrs. Clark should not have testified as to the statements or to appellant's simultaneous acts, as both resulted from the marital relationship.**

*Clark,* 500 A.2d at 440 (Emphasis added).

¶ 13 We find this rule of law espoused by the *Clark* court seemingly extends the privilege to non-verbal acts done in the presence of a spouse at the time an oral confidential communication is made. However, upon our review, we find this rule is inconsistent with the facts set forth in *Clark* because there is nothing in the opinion which indicates the appellant made any confidential oral communications to Mrs. Clark at the time he broke the shotgun in half and disposed of the pieces. Moreover, the *Clark* court references no authority to support the extension of the privilege in this manner. Therefore, to the extent *Clark* is viewed as expanding the privilege to all observations by one spouse of the other, it is overruled. Consequently, the suppression court erred in relying on *Clark* to preclude Mrs. McBurrows from testifying regarding her observations relating to the disposal of the mason's level.

¶ 14 We recognize there is a split of authority over the scope of the marital

privilege. A number of jurisdictions have limited the marital privilege strictly to communications. *See State v. Newman,* 235 Kan. 29, 680 P.2d 257 (1984) (holding the statutory marital privilege under K.S.A. 60–423(b) and K.S.A. 60–428(a) does not extend to all observations of the acts of one spouse by the other but is limited to spoken or written statements or nonverbal signs or gestures seeking to transmit information from one spouse to another); *State v. Drury,* 110 Ariz. 447, 520 P.2d 495 (1974), *overruled in part on other grounds by, State v. Clark,* 112 Ariz. 493, 543 P.2d 1122 (1975) (restricting marital privilege under § 13–1802 A.R.S. to words and not acts thereby permitting testimony of one spouse's observations of another spouse's conduct); *State v. Nettleton,* 233 Mont. 308, 760 P.2d 733 (1988) (finding the communication for which the privilege under Section 26–1–802 MCA is sought must be an utterance or other expression intended to convey a message to the other spouse); *People v. Derr,* 316 Ill.App.3d 272, 249 Ill.Dec. 499, 736 N.E.2d 693 (2000), *appeal denied,* 193 Ill.2d 591, 253 Ill.Dec. 4, 744 N.E.2d 286, 2001 Ill. Lexis 25, (2001) (holding that in order to fall under the marital privilege, nonverbal conduct must clearly be a substitute for oral communications and the mere description by one spouse of general, noncommunicative conduct is not protected under the privilege); *State v. Lorenz,* 622 N.W.2d 243 (S.D.2001) (holding marital privilege only covers communications not observations); *State v. Hannuksela,* 452 N.W.2d 668 (Minn.1990) (adopting narrow construction of term "communication" to include only words, acts or gestures intended to convey meaning to the other spouse).

¶ 15 On the other hand, some other jurisdictions have expanded the privilege to protect communications, acts, or any matter that occurs between spouses by virtue of the marital relationship. *See State v.* *Carpenter,* 83 Ohio App.3d 842, 615 N.E.2d 1103 (1992) (interpreting Ohio Revised Code Ann § 2317.02(D) which provides "[h]usband or wife, [shall not testify] concerning any communication made by one to the other, or an act done by either in the presence of the other, during coverture…"); *Hall v. State,* 720 So.2d 1043 (Ala.Crim.App.1998) (interpreting the term confidential communication set forth in Ala. Rule of Evidence Rule 504 to include statements, acts and knowledge coming to the witness by one spouse's observation of the act of the other due to the confidence inspired by the marital relationship); *Shepherd v. State,* 257 Ind. 229, 277 N.E.2d 165 (1971) (finding privileged communications between husband and wife under Indiana Code 34–1–15–5 not limited to audible communications between them but include knowledge communicated by acts which would not have been done in the presence of the other but for the marital relationship); *Menefee v. Commonwealth,* 189 Va. 900, 55 S.E.2d 9 (1949) (extending the privilege beyond mere utterances or written words); *State v. Robinson,* 180 W.Va. 400, 376 S.E.2d 606 (1988) (same).

¶ 16 McCormick and Wigmore have also specifically commented on the division between the jurisdictions. McCormick advises the courts should restrict rather than expand the privilege:

All extensions beyond communications seem unjustified by the theory of this privilege. The attitude of the courts in these cases seems to reflect a confusion with the quite distinguishable purpose of preserving family harmony by disqualifying one spouse from giving any testimony whatsoever against the other. Whatever the merits of the latter principle, its attempted implementation under the guise of a communications privilege can only lead to anomalous results, for the bulk of the cases involve factual

situations in which the marriage has already been destroyed. It is believed a different attitude would be wiser, namely that of accepting the view that privileges in general, and this privilege for marital confidences in particular are inept and clumsy devices for promoting the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. Accordingly, at the very least, the movement should be toward restriction of these devices rather their expansion through theoretically dubious applications.

McCormick, Evidence § 79 (5th ed.1999). Dean Wigmore, also advocates restriction but recognizes there is no bright-line test to be applied to determine whether an act may constitute a confidential communication:

> The privilege has for its object the security from apprehension of disclosure—a security in consequence of which confidences will be freely given and not withheld. The protection therefore extends only to *communications,* not to acts which are in no way communications. The reasoning is analogous to that which establishes a similar limitation for communications between attorney and client.
>
> Nevertheless, the statutes in some jurisdictions extend the privilege to knowledge of any fact acquired in the marital relation. There is at first sight some plausibility in that extension. The confidence, it may be argued, which the husband or wife desires, and the freedom from apprehension which the privilege is designed to secure, must be supposed to be equally desirable for noncommunicative conducts as for communications.
>
> The difficulty with this argument is that it goes too far. The rationale of the privilege is clearly inapplicable to a case, for example, where the wife, unknown to the husband, observes him disposing of a dead body in the outhouse. Since the husband did not take wife into his confidence, it would be nonsense for the tribunal to deprive itself of the wife's evidence on the ground that compulsory disclosure in such cases would discourage marital confidence.
>
> At the other extreme, and properly within the privilege, however, are acts which are clearly intended to be confidential communications—for example, the conduct of a husband who brings home a package of valuables and, calling his wife's attention, says 'Note where I put this package' as he places it in the fourth desk drawer. He communicates to her not only the words but the act of placing the package.
>
> The difficult cases are the in-between ones-those in which the act is done with the knowledge that the spouse is observing it but is not a mere substitute for words.... To formulate a precise test would perhaps be impracticable. In some cases—those in which there is something in the way of an invitation by the husband of the wife's presence or attention or there are other indications that he intends for her to acquire knowledge of his act-the act is as much a communication as his words to her describing the act would be. Such an act falls within the policy of the privilege. In other cases, however—those in which the act is done solely for the sake of doing it, the indications being that the husband is indifferent to the presence of wife—there is no communication and the marital confidence aspect of the act is likely to be slight. In such cases the privilege should not be allowed to deprive the court of the evidence.

Wigmore, on Evidence § 2337 (McNaughton rev.1961).

¶ 17 Mindful of the above-stated commentary and the public policy considerations of protecting confidential communications between spouses, we find persuasive the reasoning of those jurisdictions that have restricted the privilege. We specifically rely on the case of *Newman, supra.* In *Newman,* wife observed her husband (Newman) take possession of and handle stolen property. The trial court precluded wife from testifying regarding these observations finding they constituted a confidential communication under the marital privilege, and the State appealed. At issue was whether the marital privilege set forth in K.S.A. 60–428(a) and K.S.A. 60–437 was limited to information directly and intentionally conveyed by words or included information derived by one spouse from observation of the acts of the other. The *Newman* court acknowledged the split within the jurisdictions on this issue. However, after considering the Kansas Code and the public policy interests involved, it concluded the statutory marital privilege does not extend to all observations of the acts of one spouse by the other. It found "[t]he marital privilege is limited to spoken or written statements or nonverbal signs or gestures seeking to transmit information from one spouse to another." *Id.* at 266. Therefore, the *Newman* Court held the trial court erred in suppressing wife's testimony related to her observations of her husband's handling stolen goods. *See also Bolin v. State,* 650 So.2d 21 (Fla.1995) (holding trial court did not err in allowing wife to testify regarding her observations of husband's alleged criminal activity which included loading what appeared to be the victim's body wrapped in quilt onto his truck, driving to a specific site and dumping the body).

¶ 18 Instantly, we do not find the facts of this case warrant an expansion of the privilege beyond oral or written words, expressions or gestures which are intended by one spouse to convey a message to the other spouse. The facts reveal that shortly after Mrs. McBurrows arrived home from Abington Hospital, the Appellee drove her to an abandoned church in the Germantown section of Philadelphia. When Mrs. McBurrows was in the van, she noticed two plastic bags on the floor of the front seat. One of the bags contained two mason's levels. Mrs. McBurrows was aware the Appellee had used one of these levels to strike the victim earlier that morning. The Appellee then stopped the vehicle, threw both mason's levels over an abandoned fence and indicated he was donating them. Under a narrow interpretation of § 5914, we find Mrs. McBurrows' observance of the Appellee's act of disposing of the mason's levels does not fall within the marital privilege. Similar to the circumstances set forth in *Newman,* the act observed herein did not constitute oral or written words, expressions or gestures intended to convey any message induced by the confidential nature of the marital relationship. *See also State v. Hammonds,* 141 N.C.App. 152, 541 S.E.2d 166, 2000 N.C.App. Lexis 1309 (holding wife's testimony regarding observation of her husband's act of retrieving a gun under the bed did not constitute a confidential communication under the marital privilege set forth in N.C. Gen.Stat. § 8–57(c), because act was not induced by marital relationship and wife's presence was incidental). *Compare, State v. Holmes,* 330 N.C. 826, 412 S.E.2d 660 (1992) (holding wife precluded from testifying her husband removed a gun out of a kitchen cabinet and wrapped it in sweater because the act constituted a communication and was conducted in front of wife out of a feeling of trust

induced by the marriage relationship after husband requested third parties leave).

¶ 19 Accordingly, based upon our thorough review, we hold Pennsylvania law does not extend the husband-wife privilege set forth in § 5914 to one spouse's observance of the act of another spouse. We acknowledge that in rare instances an expression or gesture by one spouse in the presence of another spouse may constitute a confidential communication where it was intended to convey a message and was induced by the confidential nature of the marital relationship. However, we are not presented with this type of situation here. Therefore, the Order of the suppression court is hereby reversed and the case is remanded for trial.

¶ 20 Order reversed. Case remanded. Jurisdiction relinquished.

¶ 21 KELLY, J., POPOVICH, J., JOYCE, J. and LALLY–GREEN, J. join.

¶ 22 JOHNSON, J. files a Dissenting Opinion in which McEWEN, P.J., DEL SOLE, J. and MUSMANNO, J. join.

JOHNSON, J., Dissenting.

¶ 1 The matter before us is an appeal by the Commonwealth from the trial court's order granting in part and denying in part Javan McBurrows's motion in limine to preclude his wife, Jane McBurrows, from testifying to her knowledge of events surrounding the tragic death of four year-old Michael Davis. Although the court's order precludes Jane McBurrows (Wife) from testifying about various communications and observations, the narrow issue raised by the Commonwealth is whether "the observation by Mrs. McBurrows[,] of Mr. McBurrows'[s] disposal of the murder weapon[,][is] a privileged confidential spousal communication[.]" Brief for Appellant at 4. The Majority finds that Wife's "observance of Appellee's act of disposing

of the mason's level does not fall within the marital privilege." Majority Opinion at 519. I disagree, and therefore, I respectfully dissent.

¶ 2 The narrow issue presented by the Commonwealth demands that we confine our analysis to whether the term "confidential communications" encompasses Wife's observation of McBurrows throwing the mason's levels into the abandoned church lot while stating that he was donating the levels. The privilege at issue is codified at 42 Pa.C.S. § 5914:

### § 5914. Confidential communications between spouses

Except as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial.

42 Pa.C.S. § 5914. The trial court concluded that McBurrows's statement to Wife that he was donating the mason's levels was a confidential communication under section 5914. The Commonwealth, however, claims that there was "no [confidential] verbal exchange" between McBurrows and Wife, and that McBurrows's conduct is not a privileged communication.

¶ 3 "Communications between husbands and wives are presumed to be confidential, and the party opposing application of the rule disqualifying such testimony bears the burden of overcoming this presumption." *Commonwealth v. Hancharik*, 534 Pa. 435, 633 A.2d 1074, 1078 (1993). "In order to come within the rule, it is essential that the communication has been made in confidence and with the intention that it not be divulged. Therefore, whether a particular communication is privileged depends upon its nature and character and the circumstances under which it was said." *Com-*

*monwealth v. Darush,* 279 Pa.Super. 140, 420 A.2d 1071, 1075 (1980), *vacated on other grounds,* 501 Pa. 15, 459 A.2d 727 (1983).

¶ 4 In this case, Wife gave the following statement to the police:

Q: What did Javan do with the two levels?

A: He pulled up in front of an abandon[ed] church somewhere in Germantown. He took the two levels and threw them over a fence.

\* \* \* \* \*

A: ... As he threw the levels he said he was donating the levels ....

Statement of Jane McBurrows, 1/13/99, at 9 (Order, 7/20/99, Exhibit A). Wife's prior testimony established that McBurrows used one of the levels to beat Davis and then, in an effort to escape subsequent detection, sought to dispose of it. McBurrows's statement that he was donating the levels incriminated him in Davis's death. Clearly, McBurrows would not want Wife to divulge a statement that implicated him in the concealment of a possible murder weapon. *See Darush,* 420 A.2d at 1075. The Commonwealth's bald claim that there was no confidential communication is insufficient to meet its burden in rebutting the presumption that this statement was confidential. Consequently, I conclude that statement was a "confidential communication" under 42 Pa.C.S. § 5914. The crux of my dissent lies with my disagreement with the Majority's conclusion that Wife's concomitant observation of McBurrows throwing the levels over the fence is not also within the privileged scope of section 5914.

¶ 5 As late as 1993, our Supreme Court in *Hancharik* stated that it had not "had occasion to actually decide ... whether the *statutory* rule, phrased solely in terms of 'confidential communications,' encompasses more than verbal exchanges." *Hancharik,*

633 A.2d at 1078 n. 3 (emphasis in original) (quoting 42 Pa.C.S. § 5914). *Hancharik* is the Supreme Court's last pronouncement on this issue.

¶ 6 Prior to *Hancharik,* this Court addressed the issue in *Commonwealth v. Clark,* 347 Pa.Super. 128, 500 A.2d 440 (1985). In *Clark,* we stated that "[w]hile there is no Pennsylvania case law regarding this issue, it would be anomalous to exclude acts done at the time the confidential oral communications were made from the protection of the privilege. The marital relationship gave rise to both the statements and the actions ...." *Clark,* 500 A.2d at 443. In *Hancharik,* our Supreme Court quoted the foregoing statement, but then immediately stated that it did not "express [an] opinion as to the correctness of this decision." *Hancharik,* 633 A.2d at 1079 n. 3. In concluding that Pennsylvania law does not extend the husband-wife privilege to one spouse's observance of the act of another spouse under the circumstances of this case, the Majority now overrules *Clark.*

¶ 7 "At common law husband and wife [were] incompetent to testify against each other." *Canole v. Allen,* 222 Pa. 156, 159, 70 A. 1053, 1055 (1908). Our legislature attenuated this rule through the enactment of laws that delineated the specific circumstances in which spouses would be competent to testify against each other. *See* Act of May 23, 1887, P.L. 158, § 2(b), (c) (then codified at 19 P.S. §§ 683, 684) (predecessors of 42 Pa.C.S. §§ 5913, 5914). While the substance of the marital privileges embodied in these statutes has undergone some tuning over the past century, the rationale justifying their existence remains unchanged.

This rule is founded upon the deepest and soundest principles of our nature. Principles which have grown out of

those domestic relations, that constitute the basis of civil society; and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down or impair the great principles which protect the sanctities of husband and wife, would be to destroy the best solace of human existence.

*Stein v. Bowman,* 38 U.S. 209, 223, 13 Pet. 209, 10 L.Ed. 129 (1839). *See also Commonwealth v. Wilkes,* 414 Pa. 246, 199 A.2d 411, 413 (1964) (stating that "The prohibition against the giving of testimony by one married party against the other is based upon consideration for preserving domestic peace, harmony and the sanctity of the marriage.").

¶ 8 Undoubtedly, it was this laudable social goal that propelled our esteemed colleague, Judge Cercone, to declare that it would be "anomalous" to protect oral confidential communications, yet exclude from the privilege testimony regarding knowledge of a spouse's conduct obtained by reason of the marital relationship. *See Clark,* 500 A.2d at 443. I concur with Judge Cercone's reasoning, and accordingly, I disagree with the Majority's decision to overrule *Clark.* In explaining its rationale for abrogating the rule espoused in *Clark,* the Majority focuses on the lack of discussion in that opinion to establish the contemporaneous quality of the statement made and the action observed, and the absence of legal authority to support the rule. Majority Opinion at 515 (stating that it finds the rule to be "**inconsistent** with the facts set forth in *Clark* because there is nothing in the opinion which indicates the appellant made any confidential oral communications to Mrs. Clark at the time he broke the shotgun in half and disposed of the pieces.") (emphasis added). Although the Court's recitation of evidence in *Clark* does not indicate that a confidential communication was made at the time of the observed conduct, the absence of such a statement, in my opinion, creates a void rather than an inconsistency and therefore, it does not diminish the authority of *Clark.* Furthermore, the Majority does not address Judge Cercone's reasoning that the observed conduct was privileged because it and the confidential communication both arose from the marital relationship. *See Clark,* 500 A.2d at 443. This factor is the linchpin of the rationale set forth in *Clark* and is at the heart of the issue now before us.

¶ 9 The issue of whether a statutory marital privilege covering "confidential communications" also encompasses knowledge acquired by one spouse's observation of the other has been addressed in many jurisdictions. While the Majority finds persuasive the reasoning of those jurisdictions that find no privilege for such knowledge, I find convincing the rationale of those jurisdictions that do not constrain the definition of a "confidential communication" to audible communications or acts intended to convey a message.

> The term communication, within the meaning of the privileged communication rule, as to husband and wife should be given a liberal construction and is not confined to mere audible communications or conversations between the spouses, but embraces all facts which have come to his or her knowledge or under his or her observation in consequence or by reason of the confidence of the marital relation, and which but for the confidence growing out of it would not have been known. It includes knowledge communicated by an act, which would not have been done by one spouse in the presence of, or within the sight of, the other, but for the confidence between them by reason of the marital relation.

*State v. Robbins,* 35 Wash.2d 389, 213 P.2d 310, 314 (1950). *See also Hall v. State,* 720 So.2d 1043, 1049 (Ala.Crim.App.1998); *Shepherd v. State,* 257 Ind. 229, 277 N.E.2d 165, 166 (1971); *Todd v. Barbee,* 271 Ky. 381, 111 S.W.2d 1041, 1043 (App. 1938); *People v. Camon,* 110 Mich.App. 474, 313 N.W.2d 322, 325–26 (1981); *Whitehead v. Kirk,* 104 Miss. 776, 61 So. 737, 738–39 (1913); *People v. Daghita,* 299 N.Y. 194, 86 N.E.2d 172, 174 (1949); *Menefee v. Commonwealth,* 189 Va. 900, 55 S.E.2d 9, 15 (1949); *State v. Robinson,* 180 W.Va. 400, 376 S.E.2d 606, 610–11 (1988). The foregoing jurisdictions all have marital privilege statutes substantially similar to Pennsylvania's section 5914. The rule adopted by these jurisdictions is consistent with the principle underlying Judge Cerone's statement in *Clark;* the privilege applies to knowledge of facts acquired by reason of the marital relation. The rationale for this rule was most eloquently stated as follows:

> But it is not enough to throw protection over communications made in the spirit of confidence. The intimacy of the marriage union enables each to be daily and almost constantly witness of the conduct of the other; and thus in fact a confidence, reaching much farther than that of verbal communication, is forced upon each of the parties. What one may even desire to conceal from all human eyes and ears is thus almost unavoidably brought within the observation of the other.... The rule we deem a valuable one, and we view with apprehension any exception having a tendency, more or less direct, to promote cunning, or to generate distrust, where the best interests of society require that perfect frankness and confidence ought to prevail. If one exception be sanctioned, because, from the character of the criminal act imputed, the dissent of the witness from its commission must be pre-
> sumed, others may follow, where the like presumption will be entertained, ... and there will be danger of our having no rule capable of general and steady application.... Moreover, the rule is not founded exclusively upon an actual voluntary confidence reposed by one of the married pair in the other, but also upon the unavoidable confidence which the intimacy of the marriage state necessarily produces.

*Whitehead,* 61 So. at 738–39 (omissions in the original) (quoting *State v. Jolly,* 20 N.C. 108 (1838)).

¶ 10 Although the aforementioned jurisdictions all have adopted a rule interpreting the term "confidential communication" to encompass knowledge of facts acquired by consequence of the marital relation, and but for the confidence arising therefrom, I find it unnecessary to consider the efficacy of such a broad rule. Rather, I would hold that when a spouse observes conduct that is wedded to a confidential utterance made by the other spouse, then the observation and the statement are not severable. McBurrows's statement that he was donating the levels coupled with his act of throwing them over the fence constitute a union that is inseparable. Thus, I conclude that pursuant to 42 Pa.C.S. § 5914, Wife is not competent to testify that she observed McBurrows throw the levels over the church fence.

¶ 11 Clearly, the facts of this case evoke emotions that militate against the preclusion of the disputed evidence. We cannot, however, be overcome by the tragedy of the events in this case. The Majority views the issue as one of an extension of Pennsylvania law. They would restrict the privilege to oral or written words, and actions intended to convey a message. I disagree. The issue is whether section 5914 derogates the common law rule to an extent so as to permit the admission of

Wife's disputed testimony. *See Canole,* 222 Pa. at 159, 70 A. at 1055 (stating that at common law husband and wife were incompetent to testify against one another). Although the facts before us beg this Court to further erode the marital privilege at issue, I would decline to do so. In so doing, I am mindful that "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence." *Trammel v. U.S.,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (omission in original) (quotation marks omitted). Nonetheless, I am compelled to acknowledge as valid the time-honored presumption of the common law that society's interest in protecting the privacy and intimacy of marital relations outweighs the evidentiary needs of the criminal justice system. Hence, I respectfully dissent.

¶ 12 McEWEN, P.J., DEL SOLE, J., MUSMANNO, J. join.